**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 18 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FEDERAL DEPOSIT INSURANCE
CORPORATION,

      Plaintiff - Appellee and
      Cross - Appellant,

    v.

UMIC, INC, a Tennessee corporation;
CHARLES ALEX DENNEY,

      Defendants - Appellants
      and Cross - Appellees,

    and

ARTHUR A. WALLACE; BRYAN F.
GREEN,

      Defendants.

Nos. 96-6089
96-6123

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D. Ct. No. CIV-89-609-T)**

---

Robert A. McLean, Wolff Ardis, P.C., Memphis, Tennessee (George Dahnke,
Abowitz & Rhodes, Oklahoma City, Oklahoma, and James W. McDonnell, Jr.,
Wyatt, Tarrant & Combs, Memphis, Tennessee, with him on the briefs), for
Defendants-Appellants-Cross-Appellees.

Jaclyn C. Taner, Counsel (Ann S. DuRoss, Assistant General Counsel, Colleen B.
Bombardier, Senior Counsel, and Lawrence E. Richmond, Counsel, with her on

the briefs), Federal Deposit Insurance Corporation, Washington, DC, for Plaintiff-Appellee-Cross-Appellant.

---

Before PORFILIO, ANDERSON, and TACHA, Circuit Judges.

---

TACHA, Circuit Judge.

---

The Federal Deposit Insurance Corporation (FDIC) brought this case to recover losses sustained by Universal Savings Association, F.A. (Universal), in trading financial futures and options between 1984 and 1986. The FDIC, as successor to the Federal Savings and Loan Insurance Corporation (FSLIC), Universal's receiver, filed suit against a number of parties, including the brokers who executed trades on Universal's behalf. One of the broker defendants settled, but the FDIC's case against the remaining defendants went to trial on theories of violations of the Commodities Exchange Act (CEA), common law fraud, and breach of fiduciary duty. The jury returned verdicts against the introducing broker, UMIC, and its sales representative, Alex Charles Denney, for breach of fiduciary duty, and against Denney for violating the CEA. The jury found in favor of the defendants on all other counts. Denney and UMIC now appeal the verdicts against them. The FDIC cross-appeals to recover prejudgment interest. We affirm in part and reverse in part.

I.   BACKGROUND

Universal was a savings and loan located in Chickasha, Oklahoma.  In early 1987, the Federal Home Loan Bank Board closed Universal and appointed the FSLIC as receiver.  Subsequently, the FSLIC, which had acquired rights to all known and unknown claims against Universal's officers and directors and against persons who performed services on Universal's behalf, transferred those rights to the FDIC in its corporate capacity as manager of the FSLIC Resolution Fund.  See 12 U.S.C. § 1821a(a) (requiring this transfer).

The conduct that is the basis for this action occurred several years earlier, beginning in March, 1984.  At that time, Universal held a large quantity of Treasury bonds that were declining in value as a result of rising interest rates.  Alex Charles Denney, an employee of UMIC, a full-service brokerage firm located in Memphis, Tennessee, made a presentation to Universal's board of directors on the use of futures and options to hedge against the risk of further interest rate increases.

Employing a hedging strategy is not unlike buying an insurance policy.  For example, by purchasing long-term put options on Treasury bonds, an investor can hedge against potential losses in his bond portfolio.  As interest rates rise, the value of the investor's bonds fall.  A put option permits the investor to sell a commodity, in this case a bond, at a fixed price within a stated period.  The

- 3 -

investor pays a small fee to the person who agrees to accept the bond if it is offered at the fixed price. If interest rates rise, the market price of the bond falls, and the investor exercises his option, delivering the bond (i.e., the put) at a profit. This profit offsets at least some of the losses that the investor incurs in his bond portfolio because of the interest rate increase. On the other hand, if interest rates fall, the price of the bond rises, and the investor does not exercise the option; the investor has paid a relatively small price for security against an interest rate increase.

After Denney's presentation, the Universal board voted to institute the hedging program and opened a commodities account with Geldermann, the firm that executed the trade orders, and with UMIC, the "introducing broker." Universal signed a customer agreement specifying that the account was to be used only for hedging. UMIC policy also restricted the accounts of financial institutions to hedging. Furthermore, Denney and UMIC were aware that Universal was subject to federal regulations limiting speculative trading by insured institutions. Universal's board authorized Bryan Green to manage the hedging program. Green reported directly to Universal's president Arthur Wallace, among others. He worked closely with Denney and UMIC, relying on them for trading advice. Green eventually moved to Memphis, the location of UMIC's offices, in order to work even more closely with Denney and UMIC.

While Universal's account was open, however, trading in it was not limited to hedging. In an attempt to improve its cash position, Universal, at Green's direction, began to use its futures and options program to speculate. Rather than buying contracts to counterbalance its bond holdings, Universal bought contracts that increased its exposure to interest rate fluctuations. Speculative trading increased steadily during the two years the account was open. In the end, only one-fifth of the 73,000 commodities contracts traded in Universal's account were hedge trades. The speculative trading in Universal's account resulted in losses of $6.2 million, over $3.4 million of which constituted commissions to Denney, UMIC, and Geldermann.

The FDIC instituted this action to recover those losses from Denney, UMIC, Geldermann, Wallace, Green, and Gregg Crosby, a former officer of a Universal subsidiary. Prior to trial, the FDIC dismissed all claims against Crosby and its breach of fiduciary duty claims against Geldermann. On the first day of trial, Geldermann settled for $600,000 on the FDIC's remaining claim against it. At the conclusion of the trial, the jury awarded the FDIC damages of $288,000 against Denney for violating the CEA, $288,000 against Denney for breach of fiduciary duty, and $624,000 against UMIC for breach of fiduciary duty. In a post-trial motion, UMIC and Denney sought to reduce the judgment against them by the amount already paid to the FDIC in related settlements: $600,000 from the

Geldermann settlement and $725,000 from a settlement in a prior FDIC action against Universal's board of directors for their conduct in managing Universal. The district court denied that motion. The FDIC then moved for prejudgment interest on the damages award under 12 U.S.C. § 1821(l), but the district court denied that motion also.

II.     DISCUSSION

Denney and UMIC appeal the judgments against them. They raise five issues on appeal, arguing that: (1) they are entitled to credits for the two previous settlements; (2) the FDIC's claims were barred by the statute of limitations; (3) the district court should have considered the defenses of ratification, waiver, and estoppel; (4) no fiduciary duty was ever established between Universal and its brokers; and (5) the FDIC's CEA claims against UMIC and Denney fail as a matter of law. The FDIC cross-appeals to recover prejudgment interest.

A.     Credit for Prior Settlements

The defendants assert that the Geldermann settlement with the FDIC and the Universal directors' settlement with the FDIC must be applied as credits against the jury awards against Denney and UMIC. The defendants base their argument on the "one-satisfaction rule." See U.S. Industries, Inc. v. Touche Ross & Co., 854 F.2d 1223, 1236 (10th Cir. 1988). Because a party is entitled to only

one satisfaction, "[w]hen a plaintiff receives an amount from a settling defendant, . . . it is normally applied as a credit against the amount recovered by the plaintiff from a non-settling defendant, provided both the settlement and the judgment represent common damages." Id. The one-satisfaction rule "applies only where the defendants' conduct resulted in a single injury." Touche Ross, 854 F.2d at 1236.

The jury's award and the two earlier settlements do not represent common damages for a single injury. Rather, we conclude that the jury awarded damages against Denney and UMIC only for the injuries that they caused. In making this determination, we examine the instructions that the district court gave the jury. Instruction number 40 is particularly relevant. That instruction read:

### Consider Each Defendant Separately

As the plaintiff sues several defendants in this case and claims that each is liable to it in damages, the jury is instructed that it must consider separately the liability of each defendant to the plaintiff under the evidence and the Court's instructions as to the law of the case. The fact that one defendant may be found liable to the plaintiff should not control your verdict with respect to the other defendant unless the jury finds, under the evidence and these instructions, that the plaintiff has also proven its case against the other defendant.

Appellant's App. at 295. Universal allegedly sustained losses of $6.2 million from its venture into the futures and options market. More than half of those losses were paid in commissions to Geldermann, UMIC, and Denney. The remainder of the losses represent a decrease in the value of Universal's futures

and options account with UMIC. Presented with this information, including the specific amount of commissions each defendant received, the jury returned its verdict after "consider[ing] separately the liability of each defendant." Id.

The verdict forms that the jury returned demonstrate that it understood its task. See Appellant's App. at 393-403. On the last page of "Verdict Form III: Commodity Exchange Act Claims," in the space for fixing the dollar amount of compensatory damages, the jury wrote, "$288,000.00 against Charles Denney." On the last page of "Verdict Form III: Claims of Fraud and Breach of Fiduciary Duties," in the damages space, the jury wrote, "an additional $288,000.00 against Charles Denney and $624,000.00 against UMIC."

The jury returned a damages award specific to each defendant. It did not attempt to award damages for the total losses that Universal incurred through the unauthorized futures and options trading. Thus, there is no basis for us to conclude that the prior settlements with Geldermann and the Universal directors cover any portion of the damages assessed against Denney and UMIC. See Touche Ross & Co., 854 F.3d at 1261 ("[A] party seeking credit for an amount received in settlement bears the burden of proving that the damages assessed against him have . . . been previously covered in a prior settlement."). The jury's award and the prior settlements do not constitute common damages.

B.      Statute of Limitations Defense

The defendants raise a statute of limitations defense, asserting that the FDIC's claims are barred because the limitations period began running more than two years before February 13, 1987, the date that Universal went into receivership. After trial, the defendants made this argument to the district court in a motion for judgment as a matter of law, see Fed. R. Civ. P. 50(b); Appellant's App. at 230, which the district court denied. We review de novo the district court's denial of a Rule 50(b) motion, applying the same standard as the district court. See Mason v. Oklahoma Turnpike Auth., 115 F.3d 1442, 1450 (10th Cir. 1997). Under that standard, we must hold in favor of the defendants if there is no legally sufficient evidentiary basis for a reasonable jury to have found that the statute of limitations barred the FDIC's claims in this action. See id.

When a financial institution enters receivership, federal law gives the FDIC three years from the date of receivership to file suit on the institution's behalf so long as the asserted claims are still alive under the applicable statute of limitations. 28 U.S.C. § 2415. There is no question in this case that the FDIC filed suit within three years of its becoming the receiver of Universal on February 13, 1987. The only question is whether the FDIC's claims were time-barred on that date. Here, the applicable statute of limitations on both the state law breach of fiduciary duty claims and the federal CEA claims is two years. Okla. Stat. tit. 12, § 95(3) (Supp. 1997); 7 U.S.C. § 25(c).

The two-year period under the CEA begins to run when trading ceases in an account in which unauthorized trades occurred. See Indemnified Capital Invs. v. R.J. O'Brien & Assocs., 12 F.3d 1406, 1411 (7th Cir. 1993). Here, trading in Universal's account did not cease until 1986, and thus, there is no question that the limitations period had not expired when Universal went into receivership.

Under Oklahoma law, the two-year period for the breach of fiduciary duty claims does not begin to run until the wrongdoing has been or, in the exercise of reasonable diligence, should have been discovered. See Resolution Trust Corp. v. Grant, 901 P.2d 807, 813 (Okla. 1995). The limitations period may be tolled if an agent charged with informing his principal of unauthorized acts fraudulently conceals the wrongdoing from his principal. See Stephens v. General Motors Corp., 905 P.2d 797, 799 (Okla. 1995) (quoting Kansas City Life Ins. Co. v. Nipper, 51 P.2d 741 (Okla. 1935)). Where there has been fraudulent concealment of actionable wrongdoing, the statute of limitations begins to run when the wrongdoing is actually discovered. With respect to the breach of fiduciary duty claims, then, the question is whether the FDIC presented sufficient evidence to support a factual finding that (1) Universal's board of directors did not discover the unauthorized trading before February 13, 1985 and could not have done so even in the exercise of reasonable diligence before February 13, 1985, or (2) the unauthorized trading was fraudulently concealed from Universal's board of

directors such and they did not discover the unauthorized trading until after February 13, 1985.

According to the defendants, Universal should be deemed to have had full knowledge, prior to February 13, 1985, of the speculative trading because Wallace and Green had daily involvement in the trading, both were officers of Universal, and neither one fraudulently concealed the nature of the trading from the board of directors. The FDIC responds by arguing that the jury made a finding that this suit was timely and that the evidence supports that finding. The district court instructed the jury on the defendants' statute of limitations defense. Appellant's App. at 293-94 (Instruction No. 39). That instruction fairly represented Oklahoma law.

From the record we have before us, it does not appear that the district court required the jury to provide a written verdict on the statute of limitations defense. Nevertheless, because the jury returned a verdict in favor of the FDIC on some of its claims, it implicitly rejected the defense and made one of the above-mentioned factual findings.

Because we conclude that there was sufficient evidence to support both of those findings, we reject the defendants' statute of limitations defense. Unauthorized trading continued until April, 1986. Each of the directors who testified stated that Universal's board never authorized speculative trading.

UMIC and Denney presented no evidence that the board authorized speculative trading. In fact, Green testified that he had never seen any board resolution authorizing such trading.

In addition, there is no evidence that Wallace or Green ever affirmatively informed the board of directors that Universal was engaging in speculative trading. The defendants counter that the board received information regarding speculative trading from independent sources, and therefore, it should have discovered the unauthorized trading before February 13, 1985. Those sources include, among others, written confirmations of specific trades, monthly reports of trading activity, detailed ledgers of trading activity, and monthly and quarterly reports to the Federal Home Loan Bank Board (FHLBB). The nature of these sources, however, would not indicate to the reader that the trading was speculative unless the reader of those sources had a sophisticated understanding of the futures and options commodities market. The evidence fully supports the conclusion that none of the directors possessed that sophisticated knowledge. Thus, there was sufficient evidence for a jury finding that Universal's board of directors did not know and could not have discovered the unauthorized trading.

Furthermore, as officers of Universal, Wallace and Green could only take actions that were authorized by the board of directors. Sufficient evidence was presented at trial for the jury to conclude that Wallace and Green approved

transactions that they knew the board had not authorized and that they then failed to adequately inform the board of these facts. The jury could reasonably have treated this nondisclosure as fraudulent because the district court instructed the jury that nondisclosure may constitute fraud if, "[w]hen dealing with another, a person has a duty to disclose a material fact . . . known to him and . . . he knows the fact is peculiarly within his knowledge and the other person is not in a position to discover the fact for himself . . . ." Appellant's App. at 263-64 (Instruction No. 17). The defendants do not challenge this instruction, and therefore, we treat it as a correct statement of the law. We also conclude that sufficient facts existed for a jury to find that Wallace and Green fraudulently concealed their knowledge of the speculative trading despite a duty to disclose. Accordingly, the defendants' statute of limitations defense fails.

We note that although the jury could have found that Wallace and Green fraudulently concealed their knowledge of the speculative trading from Universal's board of directors, the jury also found in their favor on the FDIC's claims against them. We express no opinion on this possible inconsistency because the defendants do not raise that issue on appeal. See State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

C.    Ratification, Waiver, and Estoppel Defenses

The defendants next argue that the district court erred (1) in not directing a verdict[1] in their favor based on the defenses of ratification and waiver, and (2) in failing to instruct the jury on the defenses of ratification, waiver, and estoppel.

Because the defendant did not meet the evidentiary threshold to justify a jury instruction on these defenses--which is much lower than that required for a directed verdict--we reject both arguments. Although state law would have governed the substance of the proposed instructions, federal law determines whether the denial of the jury instructions was proper. See Dillard & Sons Const. Inc. v. Burnup & Simms Comtec, Inc., 51 F.3d 910, 915 (10th Cir. 1995). Jury instructions should be given only if they are supported by competent evidence. See Farrell v. Klein Tools, Inc., 866 F.2d 1294, 1297 (10th Cir. 1989). Our cases are not in complete accord on the proper standard under which to review a district court's determination that a party has not presented sufficient evidence to justify a jury instruction. Compare United States v. Wolny, 1998 WL 2480, at *8 (10th Cir. Jan. 6, 1998) (suggesting review is de novo), with Wilson v. Union Pacific Railroad Co., 56 F.3d 1226, 1232 (10th Cir. 1995) (suggesting review is for abuse

_____

[1] Although the current version of Rule 50 uses the term "judgment as a matter of law" rather than "directed verdict," the difference is in name only; there is no difference in substantive meaning between the two terms. See Fed. R. Civ. P. 50 advisory committee's note (1991).

of discretion). Nonetheless, because the district court's decision was correct even when reviewed de novo, we uphold it.

A successful ratification defense would require evidence that Universal's board intentionally treated the unauthorized speculative trading as authorized, or knowingly accepted the benefits of such unauthorized trading. See Outboard Marine Ctr. v. Little Glasses Corp., 338 P.2d 1101, 1104 (Okla. 1959). A successful estoppel defense would require evidence that the Universal board's words or conduct led the defendants to believe that the trading in the UMIC account was authorized and that the defendants changed their position on the basis of the board's words or conduct to their detriment. See Bay Petroleum Corp. v. May, 264 P.2d 734, 736 (Okla. 1953). A successful waiver defense would require evidence that Universal's board intentionally relinquished the right to complain about the speculative trading. See id. at 736. There was simply no evidence presented at trial to support any of these three defenses.

As we stated above, none of the members of the board of directors possessed a sophisticated knowledge of the futures and options commodities market. Further, it is undisputed that the board never adopted any resolution authorizing trading for speculative purposes. While the evidence suggests that some of the directors knew that the trading in the UMIC account would earn Universal profits, this could not lead one to conclude that the board knew or

- 15 -

approved of the speculative trading. Indeed, the design of the hedging strategy that the Universal's board adopted was to earn profits in case rising interest rates cut further into the value of Universal's bond portfolio. There was no evidence presented that the board knew and understood that speculative, non-hedge trading was occurring. Accordingly, there was no evidence to support a finding of the defenses of ratification, estoppel, or waiver. The district court properly denied the defendants' directed verdict motion and proposed jury instructions.

D.    Breach of Fiduciary Duty Claims

The defendants assert that the district court erred in denying their motion for judgment as a matter of law on the breach of fiduciary duty claims against UMIC and Denney. Furthermore, the defendants argue that even if there was sufficient evidence to send those claims to a jury, the district court committed reversible error by failing to properly instruct the jury on the burden of proof required to establish a fiduciary duty.

"We review de novo the district court's determination of a motion for judgment as a matter of law, applying the same standard as the district court." Mason v. Oklahoma Turnpike Auth., 115 F.3d 1442, 1450 (10th Cir. 1997). Judgment as a matter of law is appropriate only if no reasonable juror could find in favor of the opposing party. See id. We review the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the

jury's verdict.  See MidAmerica Fed. S & L v. Shearson/American Express, 886 F.2d 1249, 1251 (10th Cir. 1989).

The defendants base their argument on the fact that there was insufficient proof that they were fiduciaries of Universal.  Under Oklahoma law, a fiduciary relationship exists whenever trust is placed by one person in the "integrity and fidelity" of another.  In re Beal, 769 P.2d 150, 154 (Okla. 1989).  The relationship is based on either an express or implied agreement where it can be said the minds have met to create a mutual obligation.  See Lowrance v. Patton, 710 P.2d 108, 111-12 (Okla. 1985).  Before a court will declare a relationship fiduciary, there must be a weakness on one side and a strength on the other, resulting in trust justifiably reposed in the other.  See Beal, 969 P.2d at 155.

From the day that Denney made his March 1984 presentation to the Universal board, he held himself and his company, UMIC, out as experts in financial commodities trading.  There was testimony that Denney provided substantial guidance to Green and Wallace in trading in Universal's account at UMIC.  Denney and UMIC did not just execute trade orders at the direction of Universal's officers.  They actively provided advice and direction to Universal. These facts provide sufficient evidence from which a reasonable jury could conclude that the defendants owed Universal fiduciary obligations.

We next turn to the defendants' assertion that the district court should have

instructed the jury that the existence of a fiduciary duty had to be established by clear and convincing evidence. "[W]e conduct a de novo review to determine whether, as a whole, [the jury instructions] correctly state the governing law and provided the jury with an ample understanding of the issues and applicable standards." Harrison v. Eddy Potash, Inc., 112 F.3d 1437, 1442 (10th Cir. 1997) (citations omitted).

The only case that the defendants rely upon for their proposed clear and convincing standard of proof is Devery Implement Co. v. J.I. Case Co., 944 F.2d 724 (10th Cir. 1991). In that case, the district court instructed the jury that it had to find by clear and convincing evidence that a fiduciary relationship existed between two parties that had entered into a dealership agreement. Because neither party to the appeal objected to the instruction, this court reviewed only for plain error. See United States v. Voss, 82 F.3d 1521, 1530 (10th Cir.), cert. Denied, 117 S. Ct. 226 (1997). We merely determined that the instruction "provided the jury with a reasonable picture of the Oklahoma requirements for a fiduciary relationship," particularly in light of the fact that a "fiduciary relationship is atypical in a contract setting." Id. at 731. This case does not involve such an atypical setting, and thus, we conclude that there is no need for the higher threshold for finding a fiduciary relationship between Universal and the defendants. The district court did not err in instructing the jury about breach

of fiduciary duty.

E.     CEA Claims

Denney finally argues that the district court erred in refusing to grant it

judgment as a matter of law on FDIC's fraud claims against him under sections 4b

and 4c(b) of the CEA.  As stated above, we review the district court's denial de

novo.  See Mason, 115 F.3d at 1450.  Judgment as a matter of law is appropriate

only if no reasonable juror could have found in favor of the FDIC.  See id.  We

review the evidence in the light most favorable to the jury's verdict.  See

MidAmerica Fed. S&L, 886 F.2d at 1251.

Section 4b of the CEA provides, in relevant part:

> It shall be unlawful . . . for any person, . . . *in connection with* any order to make, or the making of,  . . . any contract of sale of any commodity *for future delivery* . . . on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity . . . (i) to cheat or defraud or attempt to cheat or defraud such other person; (ii) willfully to make or cause to be made to such other person any false report . . . .

7 U.S.C. § 6b(a)[2] (emphasis added).  Section 4c(b) of the CEA and the

corresponding rules promulgated by the Commodities Futures Trading

Commission contain similar prohibitions with reference to commodity option

---

[2] Except for minor changes that are not relevant here, section 4b of the CEA is the same today as it was in 1984.

contracts.  See 7 U.S.C. § 6c(b); 17 C.F.R. §§ 32.9 & 33.10 (1997).[3]

Denney asserts that the record does not contain evidence from which a jury could determine that, "in connection with" an order of the sale of a futures contract, he misrepresented material facts and executed unauthorized trades and that Universal relied upon his misrepresentations.  The "in connection with" language of section 4b of the CEA requires the alleged fraud to concern the fundamental nature of the futures contract; that is, the fraud must involve the quality of or the risks associated with the investment.[4]  See Kearney v. Prudential-Bache Securities, Inc., 701 F. Supp. 416, 424, 425 (S.D.N.Y. 1988) (citing Rule 10b-5 cases in which brokers' representations were actionable because they led investors to believe that broker had proper experience and financial stability to handle account or that investments were less risky than they actually were).  Evidence was presented at trial that Universal's board of directors relied on Denney's representations at the March 1984 presentation.  At the presentation, Denney and other UMIC personnel explained to Universal's board how a low-risk hedging program using financial futures and options could help the S&L offset

---

[3] There have been no significant changes to either the statutory section or the regulations promulgated thereunder since 1984.

[4] We note that courts faced with interpreting the anti-fraud provisions of the Commodities Exchange Act look to the more developed body of law addressing section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. See Saxe v. E.F. Hutton & Co., 789 F.2d 105, 109 (2d Cir. 1986).

large potential losses in its treasury bond portfolio. Although the board only authorized hedge trades, Denney recommended and executed high risk trades that he knew were speculative. There was also evidence that Universal's board did not have a sophisticated understanding of the commodities market.

Statements about the risk associated with a particular investment are "in connection with the making" of that investment because they concern the basic question of whether or not a person should invest her money. See Saxe, 789 F.2d at 110 (holding that misrepresentations regarding the type of trading for which a client's funds would be used is actionable under the CEA). Denney did not have merely peripheral contact with Universal and its futures and options account. He promoted the hedging program, made recommendations to Universal's management, supervised the trading activity in the account, and executed orders on Universal's behalf.

To counter the assertion that he never executed unauthorized trades and that Universal did not rely upon his alleged misrepresentations, Denney asserts that he merely implemented the decisions of Universal's managers in charge of the hedging account, Wallace and Green. This assertion is contradicted by evidence that demonstrates that Denney was actively involved in Universal's hedge account and made speculative trade recommendations almost daily, most of which Wallace and Green followed. This case is not one of a detached broker who, while sitting

in his office one day, received a call from a client who wanted to make a couple of investments. This case involved an aggressive campaign, clothed as a low-risk hedge program, to trade speculatively in the commodities market, with the possibility of huge return but with the concomitant risk of huge losses. We find that sufficient evidence existed to support the jury's verdict on the CEA claims.

F.    Prejudgment Interest

Following the jury's damages award, the FDIC sought prejudgment interest under section 1821(l) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). That section provides, in relevant part:

> In any proceeding related to any claim against [an S&L's] director, officer, . . . or any other party employed by or providing services to [the S&L], recoverable damages determined to result from the improvident or otherwise improper use or investment of [the S&L's] assets shall include principal losses *and appropriate interest*.

12 U.S.C. § 1821(l) (emphasis added). The district court held that section 1821(l), enacted four months after this suit was filed, should not be applied to this case. See Order, at 7 (May 31, 1995). We affirm that finding, and hold that prejudgment interest cannot be awarded under section 1821(l) when the conduct upon which the judgment is based occurred before enactment of FIRREA.

The Supreme Court's decision in Landgraf v. USI Film Products, 114 S. Ct. 1522 (1994), set forth the basic calculus for analyzing whether a court should apply newly enacted legislation to a pending case. The first question is whether

Congress has expressly prescribed the law's temporal reach. See Lennox v.

Evans, 87 F.3d 431, 432 (10th Cir. 1996) (applying Landgraf), rev'd on other

grounds by United States v. Kunzman, 125 F.3d 1363 (10th Cir. 1997). If

Congress has included an express command in the statute, that command governs

the question. See Landgraf, 114 S. Ct. at 1505.

If no express command exists, Landgraf directs the court to ask a second

question: does the statute have "retroactive effect"? See Landgraf, 114 S. Ct. at

1505. If it does have such an effect, the court cannot apply the law to the case

before it. A statute does not have retroactive effect merely because it is applied

to conduct, or a complaint, that predates the law's enactment. See id. Rather, a

new statute has "retroactive effect" when applied to a pending case "if 'it would

impair rights a party possessed when he acted, increase a party's liability for past

conduct, or impose new duties with respect to transactions already completed.'"

Id. The Supreme Court recently reaffirmed Landgraf's holding and underscored

that there exists a strong presumption against retroactivity. See Hughes Aircraft

Co. v. United States, 117 S. Ct. 1871, 1876 (1997); Lindh v. Murphy, 117 S. Ct.

2059, 2062 (1997).

The Supreme Court in Lindh did not strictly follow the Landgraf calculus.

Nor did it, however, alter Landgraf's holding or general applicability to

retroactivity determinations. In Lindh, the Court examined whether Chapter 153

- 23 -

of the Anti-Terrorism and Effective Death Penalty Act (AEDPA) applies to cases pending at the time of its enactment. After concluding that Chapter 153 does not contain an express command regarding its temporal reach, the Court drew the following negative inference: because Chapter 154 of the AEDPA includes an express command that its provisions should apply to pending cases and because Congress passed Chapters 153 and 154 simultaneously, the absence of such a command in Chapter 153 means that Congress intended for Chapter 153's provisions to apply only to subsequently filed cases. See id. at 2063-2068.

Lindh merely clarified that Landgraf does not make traditional rules of statutory construction completely irrelevant to retroactivity problems. See Lindh, 117 S. Ct. at 2063. If the district court, using normal rules of construction, can conclude that a statute should not be applied to the case before the court, there is no need to address Landgraf's question of whether the statute would have a retroactive effect. See Lindh, 117 S. Ct. at 2063 ("Although Landgraf's default rule would deny application when a retroactive effect would otherwise result, other construction rules may apply to remove even the possibility of retroactivity . . . ."); United States v. Perez, 129 F.3d 255, 259 (2d Cir. 1997) (interpreting Lindh to mean that "[i]f the customary rules of statutory construction suggest that a new provision does not apply, the new provision is inapplicable.").

In essence, Lindh adds one step to the Landgraf test to produce a three-part

test. In the first step, as stated above, the court determines whether Congress included an express statement in the statute regarding its temporal reach. See Landgraf, 114 S. Ct. at 1505. If Congress has expressly addressed the question, the analysis is over. If not, the court proceeds to the second step and employs normal rules of statutory interpretation to determine whether the statute should be applied to the case before the court. See Lindh, 117 S. Ct. at 2063. If the court determines, even after employing these interpretive techniques, that Congress did not address the temporal reach of the statute, the court must then proceed to Landgraf's question of whether the statute would have retroactive effect. See Landgraf, 114 S. Ct. at 1505.

We now apply the *three*-step Landgraf/Lindh test. Under step one, it is clear that FIRREA, and section 1821(l) in particular, contains no express command regarding its applicability to pending cases. See Oklahoma Radio Associates v. FDIC, 987 F.2d 685, 696 (10th Cir. 1993). Under step two, we conclude that FIRREA, unlike Chapter 153 of the AEDPA at issue in Lindh, is devoid of trustworthy indications from Congress regarding the statute's applicability to pending cases. Neither the text of the statute nor its structure speaks to the matter. Furthermore, "there appears to be a consensus among the courts that clear indications on retroactivity cannot be found in the legislative history." Id. (collecting cases).

Because the usual modes of statutory construction do not shed light on FIRREA's temporal reach, we necessarily turn to step three, the Landgraf retroactive effect question. See Turkhan v. INS, 123 F.3d 487, 489 (7th Cir. 1997); In re Hanserd, 123 F.3d 922, 934 (6th Cir. 1997). We must determine whether application of section 1821(l) in this case would give the law "retroactive effect." Denney and UMIC state that if the court applies section 1821(l) in this case, thereby imposing prejudgment interest on the damages they must pay the FDIC, the law would materially increase their liability for past conduct. Such a penalty, they argue, is inconsistent with Landgraf. The FDIC counters by asserting that prejudgment interest involves a procedural question that, although increasing the losing party's total liability, does not implicate that party's substantive rights or upset any settled expectations.

Prejudgment interest presents a difficult question for purposes of retroactivity analysis. Cf. Landgraf, 114 S. Ct. 1522, 1526 (Scalia, J., concurring) ("[A] statutory provision for attorney's fees presents a difficult case."). On the one hand, Landgraf states that a new statute has retroactive effect if it "increase[s] a party's liability for past conduct." Id. at 1483. There is no question that imposing prejudgment interest on Denney and UMIC here will increase their liability, and that the compensatory damages on which the interest would be imposed are for conduct predating the enactment of FIRREA. It is

immaterial that the prejudgment interest rule merely increases the liability of a party rather than making conduct unlawful that was lawful when it took place. "The extent of a party's liability, in the civil context as well as the criminal, is an important legal consequence that cannot be ignored." Id. at 1507. The Court has never "read a statute substantially increasing the monetary liability of a private party to apply to conduct occurring before the statute's enactment." Landgraf, 114 S. Ct. at 1507.

On the other hand, prejudgment interest is quite analogous to attorney's fees, and Landgraf reaffirmed a prior holding of the Court that an attorney's fee statute could be applied to a case pending during its enactment. See Bradley v. Richmond School Board, 416 U.S. 718, 724 (1974), discussed in Landgraf, 114 S. Ct. at 1502-03; but see Landgraf, 114 S. Ct. at 1523, 1526 (Scalia, J., concurring) ("I see nothing to be gained by overruling [Bradley], but neither do I think the indefensible should be defended"). Both attorney's fees and prejudgment interest provisions seem to increase a party's liability for past conduct (i.e., the conduct that is the subject of the lawsuit). They are both available only after the court has determined that the party is entitled, by virtue of some other law, to compensatory or injunctive relief.

In Landgraf, the Court gave two reasons why the attorney's fees statute at issue in Bradley did not have a "genuinely 'retroactive'" effect on the litigants.

Neither rationale applies to the prejudgment interest provision at issue in this case. The first reason given is that attorney's fees are "'collateral to the main cause of action' and 'uniquely separable from the cause of action to be proved at trial.'" Landgraf, 114 S. Ct. at 1503 (quoting White v. New Hampshire Dept. Of Employment Security, 455 U.S. 445, 451-52 (1982)). Based on White, the Court found attorney's fees similar to procedural rules, which do not have a retroactive effect when applied to pending cases. See Landgraf, 114 S. Ct. at 1502-03. White held that a postjudgment motion for attorney's fees was not a motion to alter or amend judgment under Fed. R. Civ. P. 59(e). Central to White's reasoning was the fact that attorney's fees have never been considered compensation for the conduct giving rise to the suit. See White, 455 U.S. at 452. However, "unlike attorney's fees, which at common law were regarded as an element of costs and therefore not part of the merits judgment, prejudgment interest traditionally has been considered part of the compensation due plaintiff." Osterneck v. Ernst & Whinney, 489 U.S. 173, 175 (1989) (citation omitted) (holding that a postjudgment motion for attorney's fees is a motion to alter or amend judgment under Fed. R. Civ. P 59(e)). Thus, because prejudgment interest, unlike attorney's fees, is tied so intimately to the substance and merits of the case itself, see id., it cannot be said that it belongs to the family of procedural rules.

Secondly, the Landgraf Court pointed out that the award of attorney's fees

under the new statute did not increase the defendants' liability because the attorney's fees award was justified under pre-existing common law rules. See Landgraf, 114 S. Ct. at 1503 (discussing Bradley, 416 U.S. at 721). In fact, the Court intimated that the trial court would have abused of its discretion if it had refused to award attorney's fees under the common law theory. See id. at 1503 ("[I]t would be difficult to imagine a stronger equitable case for an attorney's fees award than a lawsuit in which the plaintiff parents would otherwise have to bear the costs of desegregating their children's public schools."). In this case, the prior availability of prejudgment interest is much less clear.

In the absence of FIRREA, state law governs the availability of prejudgment interest on the breach of fiduciary duty claim. See FDIC v. Oldenburg, 34 F.3d 1529, 1538 (10th Cir. 1994). Oklahoma allows recovery of prejudgment interest on "damages certain, or capable of being made certain by calculation." Okla. Stat. Ann. tit. 23 § 6 (West 1987). While judicial interpretations of this language do not preclude the FDIC from recovering under the statute, it is not clear, as it was in Bradley, that a district court would abuse its discretion by refusing to grant the award. See Liberty Nat'l Bank & Trust Co. v. Acme Tool Div., 540 F.2d 1375, 1383 (10th Cir.1976) (noting that Oklahoma courts do not award interest when a trial is necessary to determine the amount due). In the absence of FIRREA, the federal rule on prejudgment interest governs

the CEA claim.  See Touche Ross, 854 F.2d at 1254.  Like the grant of interest under Oklahoma law, it is discretionary, and we cannot say with certainty that the district court's decision would have gone one way or the other.

Thus, neither of the two reasons that the Landgraf Court gave for applying an attorney's fee statute to a pending case applies to prejudgment interest.  A prejudgment interest award not only substantially increases monetary liability for proscribed conduct, but it is also very closely tied to the amount of harm done by that conduct.  It has all the indicia of a substantive rule that cannot be applied retroactively without an instruction from Congress, either in the form of an express command or as determined by the court through traditional statutory construction, to do so.  Therefore, FIRREA's prejudgment interest provision cannot be applied in this case because the conduct giving rise to prejudgment interest liability occurred before the passage of FIRREA.

Thus, we agree with the district court's conclusion on the applicability of FIRREA to this case, but we find fault with the court's subsequent legal conclusions.  Because FIRREA is inapplicable, the district court was charged with deciding whether prejudgment interest was available under pre-existing law.  The opinion below summarily denied the FDIC's motion for prejudgment interest on the grounds that "[t]he FDIC offers no persuasive authority that would require the adoption of a federal common law rule governing prejudgment interest in this

case." This reasoning is misguided for two reasons. We address separately the implications of the district court's statement for the state law claims and the federal claims.

First, the district court's statement is incorrect as applied to the state law breach of fiduciary duty damages awards because we must look to state law, not federal law, in determining whether to award prejudgment interest on state law claims. See Oldenburg, 34 F.3d at 1538; Touche Ross, 854 F.2d at 1254-55. On remand, the district court must determine whether prejudgment interest should be imposed under Oklahoma law on those jury awards.

Second, with respect to the federal CEA damages award, contrary to the district court's assertions, our precedents do establish that prejudgment interest normally should be awarded on successful federal claims. See, e.g., Kleier Advertising, Inc. v. Premier Pontiac Inc., 921 F.2d 1036, 1040-42 (10th Cir. 1990). "[A]n award of prejudgment interest under federal law is governed by a two-step analysis." Touche Ross, 854 F.2d at 1257. First, the trial court determines whether prejudgment interest would compensate the injured party or duplicate damages already awarded. See id. If the award would compensate, the "court must still determine whether the equities would preclude the award of prejudgment interest." Id. On remand, the district court must engage in the analysis required by Touche Ross to determine whether prejudgment interest

should be awarded to the FDIC on the successful CEA claim against Denney.

III.    CONCLUSION

Because the district court correctly concluded that the defendants are not entitled to credit for any prior settlements; that the FDIC's claims were not barred by the statute of limitations; that no evidence was presented at trial to support the defenses of ratification, waiver, or estoppel; and that sufficient evidence was presented at trial to support the jury's verdict on both the federal CEA claim and the state law breach of fiduciary duty claims, the district court's determinations on those issues are AFFIRMED.

Because we conclude that application of 12 U.S.C. § 1821(l) in this case would have an impermissible retroactive effect, we agree with the district court's conclusion that section 1821(l) does not apply to this case, but we disagree with the court's conclusion that there is no pre-existing law on whether the FDIC is entitled to prejudgment interest.  Accordingly, we VACATE the district court's denial of prejudgment interest and REMAND for findings on that issue under the appropriate state and federal law, as outlined in this opinion.