F I L E D
United States Court of Appeals
Tenth Circuit

JAN 6 1998

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS
TENTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

BOLESLAW WOLNY,

    Defendant-Appellant.

No. 96-4169

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 94-CR-37-W)

Stewart C. Walz, Assistant United States Attorney, Salt Lake City, Utah, for
Plaintiff-Appellee (Scott M. Matheson, United States Attorney, with him on the
brief).

G. Fred Metos, Salt Lake City, Utah, for Defendant-Appellant.

Before KELLY, HOLLOWAY, and HENRY, Circuit Judges.

HENRY, Circuit Judge.

    Defendant Boleslaw Wolny appeals his conviction for attempted money

laundering, in violation of 18 U.S.C. § 1956(a)(3)(B). Mr. Wolny challenges the

sufficiency of the evidence, the admission of allegedly perjurious testimony, the

district court's refusal to take judicial notice of an agency regulation, and the rejection of a proposed jury instruction on the theory of the defense. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.  BACKGROUND

Mr. Wolny was arrested after a sting operation in which an FBI special agent posed as a Mexican drug dealer named Carlos Saltillo. Mr. Saltillo sought assistance in laundering one million dollars in cash, which he said were proceeds of drug sales. Mr. Wolny is a stock broker who was employed for the alleged money laundering operation. The operation was originated by Salt Lake City attorney Robert J. Nielsen and Mr. Nielsen's colleague, Paul Garfinkle.

The money was to be laundered as follows: A trust was established under the laws of the island nation of Anguilla. Mr. Saltillo was named as the trust's beneficiary. The trustee was an Anguillan, who granted Mr. Nielsen power-of-attorney to act as trustee. The drug money was to constitute the trust funds and was to be kept in an account with Kingston Securities, a brokerage house in Kingston, New York. Mr. Wolny was listed as the broker for the account. The trust funds were to be used to purchase securities. When the securities were sold, the proceeds were to be returned to Mr. Saltillo as "clean" money.

After the money laundering scheme was launched, Mr. Wolny traveled to Salt Lake City, where he planned to pick up the cash and carry it to New York. In

2

Salt Lake City, Mr. Wolny met with Mr. Nielsen, Mr. Garfinkle, and Mr. Saltillo in a hotel room, where their conversation was secretly videotaped by the FBI. After a short time, FBI agents entered the room and arrested Mr. Wolny, Mr. Nielsen, and Mr. Garfinkle.

Mr. Wolny was charged with attempted money laundering in the final count of a four-count indictment. He was not named in the first three counts, which concerned his co-defendants, Mr. Nielsen and Mr. Garfinkle. Mr. Nielsen and Mr. Garfinkle each pled guilty to one count of the indictment and did not proceed to trial with Mr. Wolny. At trial, the jury found Mr. Wolny guilty of the offense charged in Count Four.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Mr. Wolny contends that the evidence was insufficient for his conviction. "The sufficiency of the evidence is a question of law subject to de novo review." United States v. Markum, 4 F.3d 891, 893 (10th Cir. 1993). "Evidence is sufficient to support a conviction if the evidence and the reasonable inferences drawn therefrom, when viewed in the light most favorable to the government, would allow a reasonable jury to find [the] defendant guilty beyond a reasonable doubt." Id.

3

Mr. Wolny argues that the evidence was insufficient to establish the "intent to conceal" element of 18 U.S.C. § 1956(a)(3)(B). An essential element under that section is intent "to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(3)(B) (1994).

In United States v. Contreras, 108 F.3d 1255 (10th Cir.), cert. denied, 118 S. Ct. 116 (1997), we identified evidence that can be probative of an intent to conceal, including:

> unusual secrecy surrounding the transaction; structuring the transaction to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; [and] a series of unusual financial moves cumulating in the transaction . . . .

Id. at 1264-65. Contreras was decided under subsection (a)(1)(B)(i) of 18 U.S.C. § 1956, not under subsection (a)(3)(B), under which Mr. Wolny was convicted. See Contreras, 108 F.3d at 1264 ("The jury in this case convicted Ms. Contreras of violating 18 U.S.C. § 1956(a)(1)(B)(i) . . . ."). The parties believe, and we agree, that the differences between these two subsections are insignificant insofar as the evidence that is probative of an intent to conceal.

The kinds of evidence cited in Contreras were present in this case:

Unusual secrecy surrounding the transaction. The meeting between Mr. Wolny and the other participants in the money laundering operation took place in

4

a hotel room, rather than in Mr. Nielsen's office nearby. See Aple's Supl. App. at 9 (Tr. of trial test. of FBI Special Agent Carlos Villar). The participants in the meeting were frisked before they proceeded to the business at hand. See id. at 17. These circumstances suggest that the defendants may have intended, for illegitimate reasons, to keep their meeting secret.

Structuring the transaction to avoid attention. During the meeting in the hotel room, Mr. Wolny proposed breaking the million dollars into amounts of $10,000 or less, to avoid the necessity of filing a Currency Transaction Report (CTR). See id. at 78 (Tr. of videotaped meeting in hotel room). Under the applicable Treasury Department regulations, a CTR must be filed for any currency transaction in excess of $10,000. See 31 C.F.R. § 103.22(a)(1) (1994). Although Mr. Wolny's idea was later rejected, see Aple's Supl. App. at 78-79 (Tr. of videotaped meeting in hotel room), it is significant that he proposed evading the CTR requirement: "[l]egitimate business transactions are not concerned about the ramifications of filing a CTR." Aple's Br. at 21.

Depositing illegal funds with a legitimate business. As explained in the background section above, the defendants sought to process the drug money through the Anguillan trust and Kingston Securities. See Aple's Supl. App. at 1 (Tr. of trial test. of FBI Special Agent Carlos Villar).

5

Highly irregular features of the transaction.  Several features of the defendants' transaction made it highly unusual:

- Mr. Wolny flew across the country to collect one million dollars in cash, which he was to carry to New York.  See id. at 71 (Tr. of tape-recorded conversation between FBI Special Agent Carlos Villar and Mr. Nielsen).  As the government notes, "legitimate business transactions seldom, if ever, deal in this large amount of cash."  Aple's Br. at 18.

- "Even if a business transaction [were] conducted with cash, rarely would one person be allowed sole control of, or trusted with, one million dollars."  Id.

- "This is even more evident in that [Mr.] Saltillo had not personally met [Mr.] Wolny before, and would be unlikely to trust a stranger with such a large amount of cash if this were a legitimate transaction."  Id.

- Mr. Wolny was to carry the cash to New York on a private charter plane, in order to avoid detection by airport security.  See Aple's Supl. App. at 80 (Tr. of videotaped meeting in hotel room).

Using third parties to conceal the real owner of the funds.  The trust was established in Anguilla because Anguillan law would prevent any outside party, including the United States government, from discovering the source of the funds.  See Aple's Supl. App. at 2 (Tr. of trial test. of FBI Special Agent Carlos Villar).

6

Mr. Saltillo was identified only as the beneficiary of the trust, not as the person who funded it. See id. at 41 (Tr. of trial test. of Mr. Garfinkle). The trust document did not in any way reveal the source of the funds. See id.

Unusual financial moves. As explained in the background section above, under the money laundering scheme, securities would be purchased through Kingston Securities, and when the securities were sold, the proceeds would be disbursed to Mr. Saltillo as clean money. See id. at 1 (Tr. of trial test. of FBI Special Agent Carlos Villar). The jury could well have concluded that these unusual financial moves were made for the very purpose of disguising the true ownership of the funds.

Mr. Wolny contends that the source of the trust funds would have been revealed by a CTR that the defendants planned to file. According to Mr. Wolny, the CTR would have disclosed that Mr. Saltillo was a drug dealer. See Aplt's App. at 127 (blank CTR form, which asks for the "[o]ccupation, profession, or business" of the "[p]erson on . . . whose behalf this transaction was conducted").

In arguing that a CTR would have revealed the source of the trust funds, Mr. Wolny relies on the testimony of Mr. Nielsen. Mr. Nielsen testified that he intended to complete a CTR, that he was aware of substantial penalties for not completing a CTR, and that he was aware that a CTR might be returned if it was filled out incorrectly. See id. at 120-21 (Tr. of trial test. of Mr. Nielsen). Mr.

Nielsen did not testify that he intended to complete a CTR truthfully and reveal Mr. Saltillo's occupation. Although the jury may have inferred that Mr. Nielsen intended to be truthful, we are not free to draw that inference ourselves. As stated above, in evaluating Mr. Wolny's sufficiency argument, we must view the evidence in the light most favorable to the government. See Markum, 4 F.3d at 893. So viewed, the evidence suggested that the CTR would not have identified drug dealing as the source of the funds. See, e.g., Aple's Supl. App. at 46 (Tr. of trial test. of Mr. Garfinkle) (The CTR would have shown "the party making [the] deposit [with Kingston Securities] as the trust rather than Mr. Saltillo.").

Mr. Wolny further argues that he was not involved in the decision to establish an offshore trust or in other preliminary discussions about money laundering. Even the government concedes that Mr. Wolny did not become involved until after Mr. Nielsen and Mr. Garfinkle had hatched the money laundering operation. See Aple's Br. at 2.

Nevertheless, there was ample evidence that, once Mr. Wolny did become involved, he intended to conceal the nature, location, source, ownership, or control of the proceeds. The evidence discussed above was more than sufficient to support Mr. Wolny's conviction.

8

## B. Alleged Perjury

Mr. Wolny moved for a mistrial in the district court on the ground that the government knowingly used perjured testimony. See Aplt's App. at 196-97 (Tr. of mots. & instr. conf.). The district court denied Mr. Wolny's motion. See id. at 197. On appeal, we review the district court's decision for abuse of discretion. See United States v. Gabaldon, 91 F.3d 91, 94 (10th Cir. 1996).

Mr. Wolny contends that we should review de novo, rather than for abuse of discretion. He bases his argument on Ornelas v. United States, 116 S. Ct. 1657 (1996), which held that appellate determinations of reasonable suspicion and probable cause must be made de novo. See id. at 1662. Mr. Wolny contends that Ornelas requires de novo review of all mixed questions of fact and law, whether they be probable-cause determinations, decisions on mistrials, or something else.

However, Ornelas does not state that it should be extended beyond the search-and-seizure context. Furthermore, we have explicitly rejected de novo review of mistrial decisions, opting instead for an abuse of discretion standard. See Gabaldon, 91 F.3d at 94 ("We hold that when the district court has denied defendant's motion . . . for a mistrial, the defendant may not ignore this determination and seek de novo appellate review . . . . Rather, the proper course is for this court to review . . . under an abuse of discretion standard.").

9

Knowing use of perjured testimony by the prosecution violates a defendant's due process rights.  See Giglio v. United States, 405 U.S. 150, 153 (1972); see also United States v. Mills, 704 F.2d 1553, 1565 (11th Cir. 1993). For a mistrial to be declared, a defendant must show:  (1) that the testimony was false, (2) that it was material, and (3) that it was knowingly and intentionally used by the government to obtain a conviction.  Cf. McBride v. United States, 446 F.2d 229, 232 (10th Cir. 1971) (considering a 28 U.S.C. § 2255 motion to vacate a conviction).

Mr. Wolny contends that false testimony was given at his trial by Mr. Garfinkle.  At trial, Mr. Garfinkle testified that he told Mr. Wolny that Mr. Saltillo was "a major Mexican drug dealer."[1]  Aplt's App. at 96 (Tr. of trial test. of Mr. Garfinkle).  Mr. Wolny argues that this testimony was inconsistent with Mr. Garfinkle's pre-trial deposition testimony, where Mr. Garfinkle said that he

---

[1]  In full, the relevant trial testimony was as follows:

Q.  Did you ever tell Mr. Wolney [sic] how Carlos Saltillo made his money?
A.  Yes, I did.
Q.  When did you tell him that?
A.  On the morning of March 16th when we were driving from the hotel over to the meeting to pick up the cash.
Q.  What did you tell Mr. Wolney [sic]?
A.  I told him that Mr. Saltillo was a major Mexican drug dealer with a lot of cash available for investment.

Aplt's App. at 95-96 (Tr. of direct exam. of Mr. Garfinkle).

10

did not inform Mr. Wolny about the source of Mr. Saltillo's money.[2]  See id. at 101-02 (quoting relevant portions of the deposition).  What Mr. Garfinkle said to Mr. Wolny is relevant to whether Mr. Wolny had reason to believe that the funds in question were the proceeds of unlawful activity.  See 18 U.S.C. § 1956(a)(3)(B) (requiring that a person violating the statute "believe[] [the funds in question] to be the proceeds of specified unlawful activity").

We see no contradiction between Mr. Garfinkle's deposition testimony and his trial testimony.  Even Mr. Wolny concedes that the deposition testimony concerned statements that Mr. Garfinkle made before Mr. Wolny came to Salt Lake City, whereas the trial testimony concerned statements that Mr. Garfinkle

---

[2]    The record does not include a transcript of the deposition.  However, the relevant portions of the deposition were read during Mr. Garfinkle's cross-examination at trial:

Q.  And then [the prosecutor] asked you the question:
       These things aside, still you don't know any direct
    communication to Mr. Wolney [sic] about the
    explanation of this money and where it came from?
    And your response was:  I personally don't.
    Is that correct?
A.  That's correct.
Q.  And then he asked you the question:
       So if we were to look for evidence that Mr. Wolney
    [sic] knew this was drug money, you simply would have
    to look to someone besides you?
    And your response was:  Yes.  Yes.
    . . . [I]s that right, . . . Mr. Garfinkle?
A.  Yes.

Aplt's App. at 101-02 (Tr. of cross-exam. of Mr. Garfinkle).

11

made <u>after</u> Mr. Wolny had arrived in Salt Lake City.  <u>See</u> Aplt's Br. at 20.
Because the deposition and trial testimony concerned different time periods, we
cannot say that one contradicts or impeaches the other.[3]

Even if there were an inconsistency between the deposition and trial
testimony, Mr. Wolny has not shown that the trial testimony was false and, as
such, knowingly used by the prosecution.  <u>See</u> <u>McBride</u>, 446 F.2d at 232.

"Contradictions and changes in a witness's testimony alone do not
constitute perjury and do not create an inference, let alone prove, that the

---

[3]     During redirect examination of Mr. Garfinkle at trial, the government
brought out the fact that the deposition and trial testimony concerned different
time periods:

> Q.  Now . . . did [Mr. Wolny's attorney] ever change the direction of
>     his [questioning during the deposition]?  That is, was he
>     continuing to ask you questions — was it your understanding
>     that he was continuing to ask you questions about contact you
>     had with Mr. Wolney [sic] prior to coming to Salt Lake City?
> A.  Yes, that was my understanding.
> Q.  Okay.  And did you testify today that you had not discussed the
>     source of the cash with Mr. Wolney [sic] prior to coming to Salt
>     Lake City?
>                                 * * *
>     . . . [W]here did your conversation regarding the source of the
>     cash occur with Mr. Wolney [sic]?
> A.  Well, it was a conversation in the car on March 16th.
> Q.  So that was here in Salt Lake City?
> A.  In Salt Lake.
> Q.  That wasn't prior to coming to Salt Lake City?
> A.  No.

Aple's Supl. App. at 51-52 (Tr. of redirect exam. of Mr. Garfinkle).

12

prosecution knowingly presented perjured testimony." Tapia v. Tansy, 926 F.2d 1554, 1563 (10th Cir. 1991). See also United States v. Holladay, 566 F.2d 1018, 1019 (5th Cir. 1978) ("Presentation of a witness who recants or contradicts his prior testimony is not to be confused with eliciting perjury.").

However, Mr. Wolny relies on more than just the alleged inconsistency between the deposition and trial testimony to show the falseness of Mr. Garfinkle's testimony and the prosecution's knowing use of it. As to the falseness of the testimony, Mr. Wolny contends that Mr. Garfinkle had incentive to lie and frame his co-defendant, in order to curry favor with the government. The government disputes that Mr. Garfinkle had incentive to lie. See Aple's Br. at 29 n.2 (Mr. Garfinkle "had no motive to try to better the deal [he struck in his plea bargain] by providing helpful testimony; in fact, only if his trial testimony was false could he jeopardize his bargain."). However, even if the government is wrong and Mr. Wolny right, the mere fact that Mr. Garfinkle had incentive to lie does not mean that he actually did lie. See McBride, 446 F.2d at 232 ("Conclusionary allegations [of perjury] are not sufficient."). Thus, we conclude that the district court did not abuse its discretion in denying Mr. Wolny's motion for a mistrial.

13

## C. Judicial Notice

Mr. Wolny argues that the district court erred in refusing to take judicial notice of the contents of 31 C.F.R. § 103, which governs the filing of CTRs. See 31 C.F.R. § 103.22. Mr. Wolny asked the district court to admit into evidence, via judicial notice, either a summary of section 103 or the text of the regulation itself. See Aplt's App. at 12-14 ("Request for Judicial Notice"). We review a district court's decision to admit or exclude evidence for abuse of discretion. See United States v. McIntosh, 124 F.3d 1330, 1338 (10th Cir. 1997).

A judge takes judicial notice when he recognizes the truth of a matter that is either "generally known" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Mr. Wolny claims that judicial notice of section 103's contents would have clarified for the jury what information is required in a CTR. Mr. Wolny says that such clarification would have aided the jury in evaluating his defense that the defendants' plans to file a CTR negated the "intent to conceal" element of 18 U.S.C. § 1956(a)(3)(B).

Exclusion of evidence constitutes an abuse of discretion only if it causes "actual prejudice" (i.e., has a "'substantial and injurious effect or influence in determining the jury's verdict.'"). United States v. Martinez, 76 F.3d 1145, 1148 (10th Cir. 1996) (quoting United States v. Fingado, 934 F.2d 1163, 1164 (10th

14

Cir. 1991) (quoting United States v. Lane, 474 U.S. 438, 439 (1986))). In this case, the lack of judicial notice of section 103's contents resulted in no prejudice whatsoever: A blank CTR form was introduced at trial. See Aple's Supl. App. at 117-18 (blank CTR form). By examining this form, the jury could see what information was required, and judicial notice of section 103's contents would have been superfluous.

Mr. Wolny nevertheless contends that judicial notice was mandatory. He relies in part on Rule 201 of the Federal Rules of Evidence, which requires judicial notice when certain procedural requirements are met, as they were here. See Fed. R. Evid. 201(d) ("When mandatory. A court shall take judicial notice if requested by a party and supplied with the necessary information.") (emphasis added).

However, Rule 201 does not apply to judicial notice of facts such as the contents of section 103. The Rule "governs only judicial notice of 'adjudicative' facts," Fed. R. Evid. 201(a); it does not deal with judicial notice of "legislative facts." See Fed. R. Evid. 201 advisory committee notes. "Adjudicative facts are simply the facts of the particular case." Id. Legislative facts, on the other hand, "have relevance to legal reasoning and the lawmaking process," id.; they "'are established truths, facts or pronouncements that do not change from case to case but apply universally.'" United States v. Coffman, 638 F.2d 192, 195 (10th Cir.

15

1980) (quoting United States v. Gould, 536 F.2d 216, 220 (8th Cir. 1976)).  The

contents of section 103 are obviously legislative, not adjudicative, facts and thus

are not governed by the judicial notice provisions of Rule 201.

Mr. Wolny also relies on 44 U.S.C. § 1507 in arguing that judicial notice

was mandatory.  Section 1507 requires judicial notice of provisions of the Federal

Register.  See 44 U.S.C. § 1507 ("The contents of the Federal Register shall be

judicially noticed . . . .") (emphasis added).  The pertinent portions of section 103

appeared in the Federal Register.  See 52 Fed. Reg. 11442 (1987), as amended at

53 Fed. Reg. 777 (1988), 53 Fed. Reg. 4138 (1988), 58 Fed. Reg. 13547 (1993).

Thus, section 1507 would seem to suggest that judicial notice of section 103 was

required, and that the district court erred in not taking such notice.  See

Poindexter v. United States, 777 F.2d 231, 236 (10th Cir. 1985) (noting that

judicial notice of 32 C.F.R. § 750.55 was required under section 1507).

Nevertheless, we see no problem with the district court's decision:  in

effect, judicial notice was taken of section 103; the jurors were able to learn what

information is required, by examining the CTR form, a source "whose accuracy

cannot reasonably be questioned."  Fed. R. Evid. 201(b).

Mr. Wolny also claims that judicial notice could have informed the jury not

only about the contents, but also about the purpose, of section 103.  See Aplt's

App. at 14 ("Description of Facts Requested for Judicial Notice") ("The purpose

16

in requiring the filing of currency transaction reports is that such reports have a high degree of usefulness in criminal, tax or regulatory investigations or proceedings."). The blank CTR form given the jury did not address the purpose of the CTR requirement, see Aplt's App. at 127-28 (blank CTR form), nor did any other evidence admitted explain the purpose of CTRs.

Although a CTR's purpose is not an adjudicative fact governed by Rule 201, it is a fact subject to judicial notice under section 1507, as a matter that appeared in the Federal Register. See 61 Fed. Reg. 18205 (1996) (CTRs "provid[e] usable information to enforcement officials and creat[e] a deterrent against attempts to misuse the financial system"). However, we do not see what relevance a CTR's purpose, as opposed to the information required to complete one, had to the trial proceedings: to evaluate Mr. Wolny's defense that a CTR would have revealed the source of the trust funds, the jurors needed to know what information CTRs require, not why they require it. Rule 402 of the Federal Rules of Evidence states that "[e]vidence which is not relevant is not admissible." Fed. R. Evid. 402. We cannot imagine that, in enacting section 1507, Congress intended to override Rule 402, and make judicial notice mandatory, when a matter that appeared in the Federal Register is irrelevant to the proceeding at hand.

Even if the district court did err in refusing to take judicial notice, any such error was, as explained above, harmless to Mr. Wolny in light of the blank CTR

17

form given to the jury.  Accordingly, we do not believe the district court abused its discretion in refusing to take judicial notice of section 103.

### D.  Jury Instructions

Mr. Wolny argues that the district court erred in refusing to give a proposed jury instruction on the theory of the defense.  It is reversible error not to instruct the jury on a theory of the defense that is supported by the evidence and the law. See United States v. Scafe, 822 F.2d 928, 932 (10th Cir. 1987).  However, a "theory of the defense" instruction is not required if it would simply give the jury a clearer understanding of the issues.  See United States v. Grey, 56 F.3d 1219, 1222 (10th Cir. 1995).  Rather, a "theory of the defense" instruction is required only if, without the instruction, the district court's instructions were erroneous or inadequate.  See id.  We review the instructions de novo to determine whether, as a whole, they adequately apprised the jury of the issues and the governing law. See United States v. Smith, 63 F.3d 956, 965 (10th Cir. 1995), vacated on other grounds, ___ U.S. ___, 116 S. Ct. 900 (1996); Grey, 56 F.3d at 1222.

The government suggests that we should review for abuse of discretion.  It is true that we "review[ a] district court's refusal to submit a requested instruction to the jury for abuse of discretion."  United States v. Starnes, 109 F.3d 648, 650 (10th Cir.), cert. denied, 117 S. Ct. 2529 (1997); see also Grey, 56 F.3d at 1222 (The appellants "have failed to demonstrate an abuse of discretion.").  However,

18

the ultimate standard of review is de novo — to determine, as explained above, whether the instructions as a whole adequately apprised the jury of the issues and the governing law. See Smith, 63 F.3d at 965. "Discretion" comes into play in that the district judge has substantial discretion in wording the instructions, as long as they adequately present the law and the issues. See Grey, 56 F.3d at 1222; see also United States v. Davis, 953 F.2d 1482, 1492 (10th Cir. 1992) ("[A] district judge has substantial discretion in formulating the instructions; our review is confined to determining whether the instructions as a whole sufficiently cover the issues presented by the evidence and constitute correct statements of the law.").

Mr. Wolny's requested instruction would have informed the jury that the defense's theory was two-fold:

- The defense's first theory was the government had not proven that Mr. Wolny believed the proceeds were drug money. See Aplt's App. at 15 (proposed jury instr.). This theory was related to the requirement that a person violating the statute "believe[ the funds in question] to be the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(3)(B).

- The defense's second theory was that the government had not proven that Mr. Wolny intended to conceal "the nature, source, location, ownership or control" of the currency. Aplt's App. at 15 (proposed jury

19

instr.); see also 18 U.S.C. § 1956(a)(3)(B). The proffered instruction would have told the jurors that they could find that the "intent to conceal" element was negated by the defendants' plan to file a CTR. See Aplt's App. at 15-16 (proposed jury instr.).

We do not believe the district court erred in refusing to give the jury Mr. Wolny's proposed instruction. The theory of the defense was simply that the government failed to prove essential elements of the offense. In the instructions given, the district court informed the jury about the elements of the offense and about the government's burden of proving each element beyond a reasonable doubt. See id. at 29, 31 (instrs. nos. 12, 14). Mr. Wolny's proposed instruction did not concern an affirmative defense, of which the district court did not apprise the jury. Because "the substance of [the proposed] instruction was contained in the charge given to the jury," United States v. Pinto, 838 F.2d 426, 436 (10th Cir. 1988), Mr. Wolny was not entitled to a separate instruction on the theory of the defense.

Mr. Wolny nevertheless contends that the proposed instruction was needed to cure two errors in the instructions given:

**1. Lack of reference to the defense theory and the testimony bearing on it.** Mr. Wolny cites our statement in Scafe, 822 F.2d at 932, that "when a defendant presents evidence supporting a theory of defense, the trial court should

20

refer to that theory and to the testimony bearing on it." Mr. Wolny notes that the instructions here did not refer to his theory and the testimony bearing on it, but merely "parroted" the wording of the statute. Aplt's Br. at 35; see also id. at 37 ("These . . . instructions simply parrot the statute.").

The language Mr. Wolny cites from Scafe is dicta. In Scafe, we held that the evidence did not support the theory of the defense and that, therefore, no instruction on that theory was required. 822 F.2d at 932-33. Thus, we had no occasion to consider how a particular "theory of the defense" instruction should be worded.

Rather, consistent with the discretion district judges have in wording instructions, see Grey, 56 F.3d at 1222, we have rejected attempts to require "instructions [that] are essentially summaries of the evidence in the light most favorable to the defense, summaries [that are] more appropriate for closing argument." Davis, 953 F.2d at 1492. Mr. Wolny's proposed instruction was such a summary.

**2. Instruction on the "second" element.** Mr. Wolny argues that the district court erred in instructing the jury on the proof needed to establish the "second" element of the offense. This element required the government to establish that the defendant believed the funds to be the proceeds of unlawful activity. See 18 U.S.C. § 1956(a)(3)(B).

21

In connection with the "second" element, the district court instructed the jury: "It is enough that [the] law enforcement officer made the defendant aware of circumstances from which a reasonable person would infer that the money was drug proceeds." Aplt's App. at 34 (instr. no. 17). Mr. Wolny appears to argue that this instruction suggested that he need not have actually believed the law enforcement officer's representation that the funds were drug money. Mr. Wolny's proposed instruction would have informed the jury explicitly: "If the government has failed to prove beyond a reasonable doubt that the defendant was aware that the source of the currency was . . . illegal dealings in narcotics, you must find the defendant not guilty." See id. at 10 (proposed jury instr.).

Mr. Wolny's objection to the district court's instruction is unfounded. The statement he objects to is merely a definition of "representation"; it is not the entire instruction on the second element. Elsewhere, the district court clearly stated — twice — that the jury could find the second element satisfied only upon concluding that the funds were "represented by [the] law enforcement officer, and believed by the defendant, to be the proceeds of illegal drug transactions." Id. at 31 (instr. no. 14) (emphasis added); see also id. at 34 (instr. no. 17) (same).

Thus, taken as a whole, the instructions accurately apprised the jury of the issues and the governing law. We disagree with Mr. Wolny that the instructions contained errors that his proposed instruction would have cured. Accordingly, we

22

believe the district court properly declined to give the proposed instruction on the theory of the defense.

## III. CONCLUSION

For the foregoing reasons, we conclude: (1) that the evidence was sufficient to establish the "intent to conceal" element of the attempted money laundering offense; (2) that the district court properly refused to declare a mistrial based on Mr. Garfinkle's alleged perjury; (3) that the district court appropriately declined to take judicial notice of 31 C.F.R. § 103; and (4) that the district court properly rejected Mr. Wolny's proposed jury instruction on the theory of the defense. Accordingly, we AFFIRM the judgment of the district court.