**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

ROBERT CHILDS,

    Defendant-Appellant.

No. 05-8001

(D.C. No. 04CV0082-B)
(D.Wyo.)

**ORDER AND JUDGMENT** *

Before **BRISCOE, BRORBY,** and **LUCERO** , Circuit Judges.

Defendant Robert Childs was convicted of three counts of wire fraud and one count of mail fraud in violation of 18 U.S.C. §§ 1343, 1341, and 2, and was sentenced to twenty-one months' imprisonment. Childs now appeals his convictions and sentence. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, affirm his convictions, and remand for resentencing.

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

I.

Childs was employed as the business manager for the Goshen County Unified School District No. 1 (the District), headquartered in Torrington, Wyoming. In 1994, Joseph Cherry, Jr. (Cherry), the owner of Mirror Image Technology, Inc. (MIT), an office equipment company, approached Childs about arranging a copier lease agreement for the District. Childs agreed to the arrangement and the District and MIT thereafter entered into a contract whereby MIT provided the District with several copiers and a service arrangement for those copiers. Cherry allegedly paid Childs $5,000.00 in cash "under the table" in connection with the arrangement. According to Cherry, the payment was in exchange for Childs not requiring MIT to go through the bidding process normally required by the District for its contracts.

In 1998, Childs and Cherry agreed to enter into a second arrangement for the lease of copiers. As with the first, Cherry allegedly paid Childs $5,000.00 in cash and Childs, in turn, allegedly assured Cherry that MIT would not have to go through the normal bidding process. Under the 1998 arrangement, MIT provided the District with a group of allegedly new copiers but sold the ownership rights to those copiers to a third-party, Tokai, which then entered into a lease agreement with the District for the copiers (the lease was subsequently assigned to a company called DeLage Landen). In other words, MIT acted as a broker in the

arrangement and subsequently provided the District with service for the copiers.

By early 1999, a problem with overages had arisen with the 1998 arrangement. Under the 1998 arrangement, each copier was allocated a certain number of copies on a quarterly basis. The District, however, was exceeding the agreed-upon number of copies and thus was incurring unanticipated expenses. To alleviate the problem, Childs and Cherry allegedly agreed to enter into a second lease agreement covering the same equipment, but with different overage provisions. According to Cherry, the plan was that MIT would make the payments on the second lease, the District would make the payments on the old lease (i.e., the 1998 lease with DeLage Landen), and the District ultimately would not have to incur any additional overage expenses.

To carry out the plan, Cherry arranged for a third-party, Copelco Capital, Inc. (Copelco), to enter into a new lease agreement with the District that mirrored the length of the 1998 lease agreement with DeLage Landen. Cherry mislead Copelco in two respects, however. First, he falsely informed Copelco that the lease would cover a group of new copiers provided by MIT, purchased by Copelco, and leased back to the District. The purpose behind Cherry's deception was to obtain from Copelco a large influx of cash (approximately $407,000.00) that MIT would allegedly use to pay for copier service and supplies to the District. The fact, however, was that MIT did not deliver any new copiers to the

3

District. Instead, the District continued to use the copiers provided to it by MIT under the 1998 arrangement. Second, Cherry, in filling out the lease application, listed the District as the lessee but listed MIT's mailing address as the District's mailing address. Cherry allegedly did this in order that MIT, rather than the District, would receive the monthly invoices in connection with the Copelco lease.

Childs assisted Cherry in several ways in carrying out the Copelco lease agreement. To begin with, Childs signed, on behalf of the District, the written Copelco lease agreement prepared by Cherry. Second, Childs obtained from the District's attorney an "opinion of counsel" letter assuring Copelco that the deal did not require competitive bidding. Third, Childs signed an equipment delivery and acceptance receipt. This document falsely assured Copelco that the District had received from MIT the copiers covered by the lease agreement. Lastly, when a representative from Copelco called the District to conduct a verbal audit before Copelco paid MIT for the copiers, Childs took the call and falsely verified that the District had received copiers matching the serial numbers listed in the written lease agreement (the serial numbers listed by Cherry in the written lease agreement actually came from various parts and attachments for the old copiers provided under the 1998 lease agreement). In return for his efforts, Childs allegedly received $5,000.00 in cash from Cherry.

4

Apparently due to Cherry's questionable business practices and MIT's shaky finances, MIT almost immediately fell behind in its payments on the Copelco lease. From approximately July 1999 through the summer of 2001, Copelco's collections department (and subsequently the collections department of CitiCorp, who took over Copelco in November 2000) regularly called or faxed Childs in an attempt to bring the lease payments current. Initially, Childs responded that MIT was responsible for making the lease payments. By the summer of 2000, however, Childs sometimes would simply promise payment on the lease or would tell the collections employees he would check into the status of payment. Finally, in late spring or early summer of 2001, the District actually made several payments on the Copelco lease, while at the same time making payments on the 1998 lease with DeLage Landen.

Both Cherry and MIT subsequently filed for bankruptcy protection, and the Federal Bureau of Investigation (FBI) began an investigation of Cherry and his business activities. That investigation lead to discovery of the 1999 Copelco lease transaction arranged by Cherry and Childs.

On March 18, 2004, Childs and Cherry were indicted on three counts of wire fraud and one count of mail fraud in violation of 18 U.S.C. §§ 1343 and 1341. Count 1 alleged that on or about March 31, 1999, Childs and Cherry faxed fraudulent documents to Copelco in violation of 18 U.S.C. § 1343. Count 2

5

alleged that on or about April 1, 1999, Childs and Cherry, by means of false pretenses, caused funds to be electronically transferred from Copelco to MIT's bank account in violation of 18 U.S.C. § 1343. Count 3 alleged that on or about July 13, 1999, Childs and Cherry transmitted by wire communications a letter from Childs on the District's letterhead directing Copelco to send copier machine lease monthly statements to MIT's address in Cheyenne, Wyoming, in violation of 18 U.S.C. § 1343. Count 4 alleged that on or about February 4, 2000, Childs and Cherry, in furtherance of their fraudulent scheme, caused a bill to be mailed from Copelco in the name of Childs but with the address of MIT's office in Cheyenne, Wyoming, in violation of 18 U.S.C. § 1341.

Cherry entered into a plea agreement with the government and the district court formally accepted Cherry's guilty plea. As part of his plea agreement, Cherry agreed to testify at trial against Childs.

The case against Childs proceeded to trial on September 30, 2004. On October 6, 2004, the jury found Childs guilty as charged in the indictment. On December 22, 2004, the district court sentenced Childs to a term of imprisonment of 21 months.

II.

*Exclusion of evidence concerning Cherry's other business dealings*

Childs contends the district court erred, and in turn violated his Sixth

6

Amendment rights, by prohibiting him from introducing evidence of similar leasing transactions engaged in by Cherry with other school districts. We review for abuse of discretion a district court's exclusion of evidence. See United States v. Wooten, 377 F.3d 1134, 1141 (10th Cir. 2004). We review de novo whether a district court's exclusion of evidence violated a defendant's Sixth Amendment right to confrontation. See United States v. Ramone, 218 F.3d 1229, 1234 (10th Cir. 2000).

To understand Childs' arguments, it is necessary to briefly review what transpired during his trial. During opening statements, Childs' counsel asserted that Childs was "as big a victim of Joe Cherry as Copelco." App. at 517. Childs' counsel further asserted that Cherry had engaged in similar fraudulent leasing transactions with two other local school districts (Arapahoe County and Kimball County), a local government (Weld County), and the University of Wyoming, and thus had a "modus operandi." Id. at 521. Accordingly, Childs' counsel asserted that the question to be decided by the jury was whether Childs helped Cherry engage in a similar transaction with the District.

During his cross-examination of Cherry, Childs' counsel at times made reference to Cherry's transactions with the other entities mentioned during opening statements. In particular, Childs' counsel briefly questioned Cherry about leasing transactions he brokered with the Arapahoe County School District

7

and the Weld County government. App. at 801, 836, 840, 852-53. When Childs'

counsel attempted to question Cherry about a document outlining what had

occurred with the Arapahoe County School District, the government objected and

the district court sustained the objection, concluding the document was

inadmissible under Federal Rule of Evidence 608. Id. at 857.

Childs' counsel subsequently attempted to cross-examine Todd Scott, an

FBI special agent and lead investigator in the case, about Cherry's transactions

with the other entities mentioned during opening statements. During that cross-

examination, the parties and district court discussed the admissibility of evidence

pertaining to Cherry's transactions with these other entities. Further, Childs'

counsel provided an offer of proof concerning the evidence he wanted to

introduce during the defense's case. That offer of proof can be summarized as

follows:

> 1) Weld County. In 1998 the County signed a copier lease with
> MIT. In September 1999, the County wanted to refinance the lease
> to obtain a lower interest rate. Pursuant to the County's request,
> Cherry purportedly refinanced the 1998 lease. However, the County
> later found out that Cherry did not pay off the original lease.
> Accordingly, the County threatened Cherry with criminal prosecution
> and he ultimately paid off the 1998 lease.
>
> 2) Arapahoe County School District. In 1998, Arapahoe County
> entered into a copier lease with MIT. In 1999, Cherry proposed a
> refinancing deal, pursuant to which Arapahoe County would receive
> a few new copiers and MIT would buy-out the 1998 lease. Arapahoe
> County agreed to the deal, but later found out that the new lease was
> secured by substantially the same equipment as the 1998 lease.

8

3) <u>Kimball County School District</u>. Kimball County entered into a lease agreement with Cherry for seven copiers. When Kimball County later decided it wanted to add two copiers to the lease, Cherry provided them with the copiers but, rather than adding them to the existing lease, he, unbeknownst to Kimball County, entered into a second lease and removed two of the older copiers. Kimball County ended up being held liable on both leases.

4) <u>University of Wyoming</u>. The University had in place a copier lease agreement with a third party. Cherry approached the University and proposed providing them with a new lease agreement covering new copier equipment. The University agreed. Unbeknownst to the University, Cherry/MIT failed to pay off the old lease.

Following this offer of proof, the district court sustained the government's objection to the proffered evidence. In the district court's view, the proffered evidence was "clearly proof of other crimes" and amounted to "an attack on Cherry's character." Id. at 1061. Further, the district court concluded the proffered evidence was not relevant to "Cherry's reputation for truthfulness." Id. In sum, the district court concluded the proffered evidence was not relevant to the issues to be decided by the jury.

Consistent with the district court's ruling, Childs' counsel did not question agent Scott further regarding any of Cherry's transactions with the other entities. Nor did Childs put on any evidence of his own following the conclusion of the government's case-in-chief (and Childs himself did not testify). During closing arguments, however, Childs' counsel again made passing references to Cherry defrauding other school districts, and continued with his general defense theme

9

that Childs was a victim of Cherry's actions.  Id. at 1141, 1145.

On appeal, Childs contends the proffered evidence "was relevant pursuant to Fed. R. Evid. . . . 402 and was admissible pursuant to Fed. R. Evid. 403, 404(b) and 405(b)."  Aplt. Br. at 12.  Rule 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority."  Fed. R. Evid. 402.  Rule 403 in turn provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  Rule 404(b) concerns evidence of "[o]ther crimes, wrongs, or acts," and provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b).

According to Childs, his proffered evidence would have established that

Cherry was able to orchestrate similar "double-funding" transactions with these other entities "without the knowledge or authority of those [entities'] personnel . . . ."[1] Aplt. Br. at 15. Such evidence, Childs argues, would have bolstered his defense that he did not actively participate with Cherry in the double-funding transaction involving Copelco, and thus was relevant to establish that he lacked the specific intent necessary to commit each of the charged crimes. When these arguments are reduced to their essence, it appears that Childs was seeking to introduce the proffered evidence to establish, circumstantially, two related points: (1) that Cherry acted alone in carrying out the fraudulent transaction with Copelco; and (2) that he (Childs) did not knowingly participate in the fraudulent transaction (i.e., he lacked the intent to defraud Copelco).

The problem for Childs, however, is that the proffered evidence did not establish that the other transactions were similar enough to the transactions at issue in this case to be considered relevant for purposes of proving or disproving his intent to engage in a fraudulent scheme with Cherry. In particular, a review of the record in this case establishes that the jury's findings of guilt likely hinged, at least in substantial part, on three aspects of the Copelco transaction involving

_____

[1] In his opening appellate brief, Childs refers only to the Weld County and Arapahoe County School District transactions. Aplt. Br. at 15. Presumably, he has abandoned any argument that evidence of the other two transactions (i.e., Kimball County School District and the University of Wyoming) was relevant and admissible.

11

Childs.  First, prior to Copelco paying MIT, Childs signed an equipment delivery and acceptance receipt which stated that the copiers covered by the Copelco lease agreement had been delivered to the District.  Aplee. App. at 4.  However, no new copiers were delivered by MIT to the District in connection with the Copelco lease agreement; rather, the District simply kept the older copiers that had previously been delivered to it by MIT in connection with its 1998 lease agreement.  Second, when a representative from Copelco called the District to conduct a verbal audit (before Copelco paid MIT for the copiers), Childs took the call and falsely verified that the District had received copiers matching the serial numbers listed in the written lease agreement (as previously noted, the serial numbers listed by Cherry in the written lease agreement actually came from various parts and attachments for the old copiers provided under the 1998 lease agreement).  Third, the documentary evidence clearly establishes that Childs was well aware that two lease agreements were in place, yet took no action against Cherry and MIT, and indeed for a short period of time directed a District employee to make payments on both leases.  Notably, there is no indication that the other transactions and evidence concerning them were similar in any of these three respects, nor would evidence of the other transactions address, or for that matter negate, Childs' specific actions which were the basis for the crimes charged.

Because the proffered evidence failed to establish the requisite similarity of the other transactions, we conclude the district court acted within its discretion in excluding that evidence at trial.[2]  See United States v. Kravchuk, 335 F.3d 1147, 1156 (10th Cir. 2003) (suggesting that evidence of past bad acts, intended for purposes of establishing a modus operandi, must be substantially similar to present act at issue); United States v. Lamb, 99 Fed. Appx. 843, 847 (10th Cir. 2004) ("At a minimum, a presentation of modus operandi evidence [falling within the scope of Rule 404(b)] must show a similarity between the past act and the present act."); cf. Chavez v. City of Albuquerque, 402 F.3d 1039, 1046 (10th Cir. 2005) (holding that "proof of a 'modus operandi' is only relevant when there is an issue regarding the defendant's identity.").  In turn, there was no violation of Childs' Sixth Amendment right to confrontation.

*Supplemental jury instruction*

After deliberating for several hours over the course of two days, the jury sent a note to the district court saying: "Need clarification of what law was broken on count 3."  App. at 1223.  Childs proposed simply instructing the jury to refer to several instructions previously given by the district court.  Id. at 1213 (Childs' proposed instruction stated: "please see instructions 27, 28, 29 and 38.").

---

[2] The district court incorrectly concluded that the proffered evidence amounted to "an attack on Cherry's character."  App. at 1061.  Nonetheless, the evidence was properly excluded for the reasons outlined above.

13

The district court chose not to give Childs' proposed instruction and instead, over Childs' objection, responded with the following supplemental instruction, which it read to the jury in open court:

> The United States contends in Count Three of the superseding indictment that Mr. Cherry and Mr. Childs executed a scheme to defraud and caused a fax to be transmitted as a wire communication from Mr. Childs on behalf of the School District to Barb Dunwoody of Copelco Capital, Inc., directing her to send copier lease monthly statements to Mirror Image Technology, 1439 Stillwater Ave., Cheyenne, Wyoming, to which the defendant has pleaded not guilty and contends that no law was broken.
> This Count charges the defendant with wire fraud and aiding and abetting.
> Please review Jury Instructions Nos. 27, 28, 29 and 30 and 38.

Id. at 1224.[3]  As previously noted, the jury continued deliberating and ultimately convicted Childs on all counts, including Count 3.

On appeal, Childs contends the district court abused its discretion by giving the supplemental instruction to the jury because (a) the instruction improperly restated the government's position, (b) the district court read the instruction twice to the jury, (c) the instruction misstated the applicable law, and (d) the instruction was not followed by a direction to read all of the instructions as a whole.  "The submission of supplemental jury instructions after the jury has retired is a matter committed to the trial court's discretion."  United States v. Williams, 403 F.3d

---

[3] The district court initially misread the supplemental instruction and, upon the government's request, read it a second time for the jury.  App. at 1214-15.

14

1188, 1197 (10th Cir. 2005) (internal quotations omitted). "Of course, we review the jury instructions as a whole to determine whether they correctly state the governing law and provide an ample understanding of the issues and the applicable standards." Id. (internal quotations omitted).

We conclude there was no error on the part of the district court. To begin with, the district court did not abuse its discretion in deciding to give a supplemental instruction in response to the jury's question. Indeed, Childs generally agreed that the district court needed to respond; he simply disagreed with the content of the response. As for the content of the supplemental instruction, Childs complains that it "did not restate the requirement of an intent to defraud or that all elements must be proved beyond a reasonable doubt." Aplt. Br. at 34. While this is true, it is clear that the district court, through its supplemental instruction, was attempting to clarify what was being charged in Count Three of the superseding indictment. Moreover, it is important to note that the district court's supplemental instruction directed the jury to "[p]lease review Jury Instructions No. 27, 28, 29, 30 and 38." App. at 1224. Those instructions, which Childs admits were correct, outlined in detail the specific allegations of Count Three, quoted the language of the statute Childs was charged with violating, defined key phrases from the statute, outlined the four essential elements the government had to establish to convict Childs under Count Three,

15

described how a defendant could violate the statute by aiding and abetting, and repeatedly emphasized that the government had the burden of proving each essential element beyond a reasonable doubt. Id. at 1263-69, 1279. Thus, considering the supplemental instruction in light of these expressly referenced instructions, it is clear that the supplemental instruction correctly stated the law. Finally, although Childs complains about the instruction being read twice by the district court, that was not an abuse of discretion, since, as discussed, the content of the instruction was proper.

*Blakely/Booker sentencing error*

After Childs was found guilty at trial, a presentence investigation report (PSR) was prepared and provided to Childs. Childs objected, in pertinent part, to two related provisions of the PSR: (1) the portion concluding that "the restitution balance owed to CitiCorp [i.e., the successor to Copelco] would be $157,772.12," and (2) the portion concluding that the amount of the loss associated with the offenses was $157,772.12, thereby resulting an a 10-level increase in Childs' base offense level. App. at 1479 (Paragraph 9 of PSR). In objecting to these provisions, Childs cited the Supreme Court's decision in Blakely v. Washington, 542 U.S. 296 (2004), and argued that "[t]he amount of funds fraudulently obtained . . . was not determined by a jury beyond a reasonable doubt and c[ould not] be considered for enhancement purposes." App. at 1492. At the sentencing

16

hearing, Childs clarified his <u>Blakely</u>-based objections, arguing that "there was no proof beyond a reasonable doubt . . . that [he] caused" the loss suffered by CitiCorp because he never certified that the District received new machines from MIT in connection with the 1999 lease. <u>Id.</u> at 1407; <u>see also id.</u> at 1408. In addition, Childs noted that, during trial, the District's attorney testified that "he settled with all of the parties to the leases" and that the District therefore "ha[d] no obligation to CitiCorp or to anyone else for copy machines in regard to the transactions that were presented in this court." <u>Id.</u> at 1409. In Childs' view, his involvement in the matter "related only to the [alleged] bribes" given to him by Cherry. <u>Id.</u> at 1411. Although the government essentially agreed with Childs, the district court overruled Childs' objections, concluding as follows:

> On the evidence that I have before me I agree with the probation officer on the $157,000 restitution figure where he said the acts of Mr. Childs appear to have been necessary for Mr. Cherry to defraud Copelco-CitiBank, and thus Mr. Childs is liable for the net restitution figure.

<u>Id.</u> at 1410. In turn, the district court concluded that the PSR's proposed ten-level enhancement was "not only appropriate, [but also] mandatory." <u>Id.</u> at 1412.

Later during the sentencing hearing, the district court rejected Childs' request to impose a sentence of probation. In doing so, the district court made the following statements on the record:

> Mr. Mackey [defense counsel], I am still smarting from having been reversed about ten days ago in another case of where I went

17

below the guidelines and gave the guy probation and the Court of Appeals reversed me just that quick. And I honestly must say, I don't think that this is a case in which the trial court can go below the guidelines. It seems to be that it is required to – it, being the Court, is required to adhere to the sentencing guidelines which were adopted by Congress and have been promulgated by the appellate courts and I think we're just stuck with them.

Bob [defense counsel], I haven't liked sentencing guidelines ever, and I think that what it did was take away judicial discretion, and I don't think that's right. I think the judge always ought to be able, as Sir Francis Bacon said, to case a merciful eye on the defendant, and but for these guidelines, I could do that.

Id. at 1429-30.

On appeal, Childs, citing both Blakely and United States v. Booker, 125 S.Ct. 738 (2005), contends the district court violated his Sixth Amendment rights by imposing the ten-level enhancement based on the amount of loss associated with his offenses. Childs also notes that the district court applied the Sentencing Guidelines in a mandatory fashion, even though the district court stated on the record that it otherwise wished to impose a sentence lower than the Guideline range.

Notably, the government agrees with Childs' position. In particular, the government acknowledges that Childs' "sentence reflects both constitutional and non-constitutional Booker error . . . ." Aplee. Br. at 53. Further, the government concedes that it "cannot credibly argue that the Booker error here was harmless." Id. at 54. Thus, the government requests that Childs' "sentence . . . be remanded for reconsideration in light of Booker." Id.

18

We likewise agree.  As asserted by Childs and conceded by the government, the district court clearly committed both constitutional and non-constitutional Booker error in sentencing Childs.  Further, Childs adequately preserved the issue by asserting Blakely-based challenges to the PSR.  Because the government has made no attempt to establish that the district court's errors were harmless, we must vacate his sentence and remand the case to the district court for resentencing.

*Cumulative error*

In his final argument, Childs contends the cumulative effect of the district court's trial errors violated his right to a fundamentally fair trial.  But since the district court did not commit any trial error, a cumulative error analysis is inapplicable.  See United States v. Oberle, 136 F.3d 1414, 1423 (10th Cir. 1998) (holding that cumulative-error analysis "'should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors'") (quoting United States v. Rivera, 900 F.2d 1462, 1471 (10th Cir. 1990) (en banc)).

We AFFIRM Childs' convictions, but REMAND this case to the district court with directions to vacate Childs' sentence and resentence Childs in accordance with Booker.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

19